STATE OF NEBRASKA, APPELLEE, V. GARRY BACHKORA, APPELLANT.
427 N.W.2d 71

Filed August 5, 1988.    No. 87-801.

Lyle Joseph Koenig for appellant.

Robert M. Spire, Attorney General, and LeRoy W. Sievers for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

A jury found the then 17-year-old defendant, Garry Bachkora, guilty of manslaughter in violation of Neb. Rev. Stat. § 28-305(1) (Reissue 1985) for the shooting death of his 14-year-old brother, Brandon. He was so adjudged and thereafter sentenced to probation for a period of 5 years. Defendant appeals, asserting the trial court erred in (1) not instructing the jury as to what constitutes an "accidental" killing, (2) failing to define "intent," and (3) its definition of "reckless." Each of the assignments of error being without merit, we affirm.

The victim died as the consequence of the hemorrhaging and shock which resulted from a gunshot wound inflicted at the center of his forehead. At approximately 8:30 on the evening of the shooting, January 22, 1987, defendant, after waiving his *Miranda* rights, told Nebraska State Patrol Investigator Raymond Smee that after he left school, he drove around Geneva for some time, then went home and fixed himself something to eat. While he ate, he placed a rifle belonging to the victim, which he had retrieved from the upstairs of the house, against his chair. The victim then came home and showed defendant a model car he was constructing. As defendant turned to look at the model, the rifle fell and discharged, and the victim in turn fell. The shooting occurred between 5:25 p.m., when the victim arrived home, and 5:47 p.m., after defendant arrived at the hospital to which he took the victim. Defendant repeated this same story through four separate recitals, denying there were any other weapons present when the victim was shot.

In the meantime, a search of the defendant's home, where he resided with his mother, revealed the rifle defendant had described, some bloody newspapers, and a spent .22-caliber casing. Outside the home, a .22-caliber Ruger pistol was found hidden beneath a propane tank. Inside defendant's automobile,

a blanket had been laid over the back seat, and some bloodstained pants were found.

Later investigation revealed that the bullet taken from the victim's brain had not been fired from the rifle. While the firearms examiner determined the spent casing found inside defendant's home came from the Ruger pistol, he could not conclusively state that the bullet found in the victim was fired from that pistol. He also testified the Ruger found at defendant's home requires approximately $3^{1}/_{4}$ pounds of pressure to pull its trigger and produces a loud sound when fired.

On January 28, 1987, State Patrol Investigator Dan Scott questioned defendant on the details of the shooting. At first, defendant told Scott the same story he earlier had given to Smee. Scott asked defendant whether it was possible that there were any other firearms nearby. Defendant then described the Ruger pistol, which he kept fully loaded and hidden outside under the propane tank. Defendant also stated that he used the gun for target practice and to shoot rabbits and birds. When asked whether it was possible that the Ruger was in the home when the victim was shot, defendant replied in the affirmative. Defendant then explained that he was holding the pistol in his right hand when the rifle began sliding to the floor. After defendant reached for the rifle with his left hand, the victim went forward off the couch onto the newspapers. Defendant stated he went into a panic, screamed at Brandon, "[W]hat the hell are you doing," noticed blood squirting from the victim's head, and realized the victim had been shot. Defendant said he did not hear a shot or feel the pistol recoil in his hand, but the pistol was pointed in the victim's direction. Defendant further told Scott that because he did not think he had enough time to call an ambulance, he carried the victim to his automobile and drove him to the hospital. Defendant, however, took the time required to hide the pistol under the propane tank and to carefully cover the back seat of his automobile with a blanket so as not to get blood on the upholstery.

Elizabeth Rose, defendant's grandmother, visited defendant the morning after he was taken to the county jail. According to her, during this visit defendant said he was not "mad" at the

victim and that while he had the gun in his hand pointing it around the room and at the victim, he thought the safety was on. Prior to the victim's arrival, defendant had been shooting at birds. According to Rose and defendant's mother, the two brothers had enjoyed a close relationship.

Defendant maintains the shooting was accidental, and thus complains in the first assignment of error that the trial court made a mistake in not instructing the jury as to what constitutes an "accidental" killing. In so urging, he admits that he neither asked for such an instruction nor objected to its absence, but reminds us that it is the duty of the trial court to instruct the jury on the law of the case whether requested to do so or not and that the failure to do so constitutes prejudicial error. *State v. Clayburn*, 223 Neb. 333, 389 N.W.2d 314 (1986); *State v. Redding*, 213 Neb. 887, 331 N.W.2d 811 (1983); *State v. Lamb*, 213 Neb. 498, 330 N.W.2d 462 (1983); *State v. Duis*, 207 Neb. 851, 301 N.W.2d 587 (1981); *State v. Ross*, 183 Neb. 1, 157 N.W.2d 860 (1968); *State v. Breaker*, 178 Neb. 887, 136 N.W.2d 161 (1965).

Although defendant does not tell us what the instruction he now thinks should have been given ought to contain, he appears to argue the jury should have been told that if it found he did not intend to fire the gun, then an accidental death occurred, but that there was no manslaughter and he could not be held responsible for his brother's death. Such a notion completely misapprehends the nature of manslaughter as defined in § 28-305(1): "A person commits manslaughter if he kills another without malice, either upon a sudden quarrel, or causes the death of another unintentionally while in the commission of an unlawful act." Neb. Rev. Stat. § 28-310 (Reissue 1985) makes, among other things, recklessly caused bodily injury an assault in the third degree, thereby rendering such a reckless act a criminal, that is, an unlawful, act. That pointing a gun at another is an unlawful act was determined early in this century in *Ford v. State*, 71 Neb. 246, 98 N.W. 807 (1904), which holds that the fact the gun pointed at the deceased was thought to be unloaded did not constitute a defense to the crime of manslaughter.

As noted in *State v. Drew*, 216 Neb. 685, 687, 344 N.W.2d

923, 925 (1984), holding that an accused's claim the gun discharged accidentally during a scuffle with the deceased was not a defense to a charge of manslaughter, the focus of the inquiry in a manslaughter case is not "whether the gun discharged *accidentally* but, rather, whether the [accused] was acting lawfully at the time the gun discharged." (Emphasis in original.) Thus, contrary to defendant's claim, whether the discharge of a gun pointed at another is intentional or otherwise is immaterial.

In this case defendant himself finally admitted that the gun which killed the victim was pointed at the victim when it discharged. Under the circumstances, there was no basis on which the court could have properly instructed the jury concerning an "accidental" killing.

The second assignment of error rests on the trial court's refusal to instruct the jury that intent is a material element of manslaughter and to define "intent" in accordance with NJI 14.11.

This is but another way of phrasing the gravamen of the contention defendant makes in connection with the first assignment of error, that the discharge of the gun must be intentional; such, as the analysis of the first assignment of error demonstrates, simply is not correct. Indeed, the very case on which defendant places major reliance in support of his thesis holds to the contrary. In *State v. Hoffman*, 227 Neb. 131, 416 N.W.2d 231 (1987), the very intoxicated accused was involved in an automobile accident resulting in the death of the driver of the other vehicle. The accused was charged, among other things, with recklessly causing serious bodily injury through the use of a dangerous instrument, in violation of a statute. The accused argued he could not be guilty of such a charge because his intoxication made it impossible for him to have formed an intent to have caused the death; in fact, the parties had stipulated that if the accused were to testify, he would say that he formed no such intent. In rejecting the accused's argument and upholding his conviction on the charge, we observed that one violates a statute predicated upon a reckless act by merely performing the act; it is not necessary that one have intended the consequences of his or her recklessness.

In connection with the third and last assignment of error, defendant concedes that the definition of "reckless" given the jury was substantially the definition he had requested. The jury was instructed:

> With respect to causing bodily injury to another person, RECKLESS shall mean acting when any person disregards a substantial and unjustifiable risk that bodily injury to another person exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, it's [sic] disregard involves a gross deviation from the standard of conduct that a law abiding person would observe in the actor's situation.

Defendant does not claim the instruction misstates the law, noting that in its essential terms the definition is that specified by Neb. Rev. Stat. § 28-109(19) (Reissue 1985) as applicable in criminal cases "unless the context otherwise requires." Rather, he condemns the instruction by seizing upon language in *State v. Pribil*, 224 Neb. 28, 32, 395 N.W.2d 543, 547 (1986), characterizing the definition as "horrendously complicated," and suggests that its complexity misled the jury. In doing so, he acknowledges the rule that where an instruction is technically correct but an accused considers it to be couched in language which a jury is likely to misunderstand or misapply, it is the accused's duty to call the court's attention to the supposed defect and present a suitable instruction. *State v. Duis*, 207 Neb. 851, 301 N.W.2d 587 (1981). He argues, however, in substance, that he should be excused from the operation of that rule because, as the trial court improperly refused to define intent for the jury, he had to ask for something, and what he requested seemed like a good idea at the time. Without getting into the merits or demerits of such a position, the fact remains that under the circumstances of this case, the instruction at issue is not only a technically correct statement of the law, it is not misleading or likely to have been misapplied by the jury.

The characterization of the instruction in *State v. Pribil, supra*, was made in the context of declaring erroneous but not prejudicial an instruction which permitted the jury to consider a

recklessly inflicted bodily injury to be a lesser-included offense of a charge requiring an intentional or knowingly inflicted injury. The concern in *Pribil* focused on the fact the defendant was put on notice only that he had to defend against an intentional or knowing act and not one which was merely reckless. That is not the situation presently before us; in this case we are dealing with but a single crime which rests solely upon a reckless act. The mere fact language is complex does not render it erroneous; at times, the expression of a complicated thought requires the use of equally intricate language. Under the circumstances, it cannot be said the court erred in instructing the jury as it did in this regard.

AFFIRMED.